## Appeal of Samuel Royer, Guardian of the Children of James M'Namara.

1. A conversion by a guardian of personal property of his wards into real estate can only be justified by imminent necessity.

2. A guardian took a conveyance of real estate in his own name to secure a debt due to his wards, and two years afterwards declared that he held the land in trust for his wards. *Held,* that the guardian be charged with the money or the land at the option of the wards.

3. A guardian is liable for losses of money of his wards incurred through culpable indifference and negligence.

Appeal from the decree of the Orphans' Court of Blair.

*May* 28. In September, 1830, James M'Namara entered into partnership with his brother-in-law, John Thompson, Jr., of Blairs-

ville, *in the business of merchandising*, under the name of Jno. Thompson, Jr., & Co., to continue for the period of five years. On 14th July, 1832, he made his will, which was proved 27th same month, whereby he authorized his executors to continue said partnership during the unexpired period, and for a still longer time should they deem it advisable. Shortly afterwards, John Stewart was appointed guardian of the four children of M'Namara. In September, 1835, Samuel Royer was married to the widow of M'Namara. The partnership was continued by the executors to 24th March, 1836. At this time Stewart and one of the executors of M'Namara called on Thompson for a settlement; a balance was found due the estate of $5,111.57. The partnership was then dissolved, and a new one formed, composed of Thompson, Patton, and Royer, who continued in the business not only his own interest (his wife's third), but likewise the two-thirds belonging to the children. This was the firm of Thompson, Patton & Co. On 19th November following (1836), Stewart petitioned for his discharge as guardian, and *prayed that he might be permitted to settle his account with his successor.* He was discharged on his own terms, and Royer was appointed. In a few weeks afterwards, Royer settled with Stewart and received from him all the notes, bonds, &c., of his wards. Thompson, Patton & Co. still continued, and by Royer's advice they engaged in the transportation business— took stock in the Pilot Transportation Company, and lost largely. On 11th July, 1839, Royer sold his interest in the firm of Thompson, Patton & Co., to John Thompson, for $5,111.57. For this sum, together with the sum of $370, being the amount of a note of Thompson's to the former guardian for money borrowed, Royer took his (Thompson's) judgment-note.

Thompson continued in business in his own name, until some time in 1840. His creditors becoming impatient, he called on Royer, and insisted on his either entering the judgment (no judgments being then against him on record), or taking a conveyance of certain real estate, in Blairsville, as a payment of the judgment-note. Royer took the lands *in his own name*, and gave up the note. He likewise received $1,700 in goods, on an individual claim against Thompson. In 1842, Royer became embarrassed, and then declared that he held two-thirds of this real estate in trust for the wards, the declaration of which trust he recorded in May 1843. In 1844, the executors filed their final accounts, and ten days afterwards, one of them came in and charged himself with $5,111.57,

D

with interest from 11th July, 1839, and exhibited Royer's receipt for the same.

In 1847, Royer was cited to file an account as guardian of the minor children of M'Namara, which he did. To this account exceptions were filed on behalf of one of the wards, to the effect that he had not charged himself with the whole amount of the personal estate of his wards, nor with $5,111.57, the net proceeds of the store, received by him, or with any part thereof, the two-thirds of said sum, with interest thereon, belonging to said minors. The account and exceptions were referred to an auditor, who reported that the exceptant had failed in sustaining his exceptions, and that the account should be confirmed as it was rendered by the guardian. Upon exceptions to this report the Orphans' Court ordered the accountant to be charged with two-thirds of the $5,111.57, with interest from 11th July, 1839, with the amount of the $370 note against Thompson, and interest, and that all debits of rents, and credits for taxes, of the lands, be stricken out. From this decree of the Orphans' Court, Royer appealed. On this appeal, the questions made in this court by the appellant were, whether he ought to be made answerable for the two-thirds of the $5,111.57, instead of the real estate—and for the note against Thompson, received by him from the former guardian.

One of the wards also appealed from the decree of the Orphans' Court, and assigned for error here—

1. The court erred in not charging accountant with interest on the Blairsville store fund from 24th March, 1836.

2. The court erred in not decreeing interest on said fund, and all other moneys in the hands of accountant belonging to his wards, to be computed to the date of the decree.

3. The court erred in not decreeing interest on said funds, to be computed to the day on which exceptions were filed to the account, viz. 22d Sept. 1847.

*Stewart* and *Kline*, for Royer.—When a trustee purchases land *bonâ fide* and as a prudent man would have done, to prevent a sacrifice, he will not be treated as a purchaser on his own account: Lewin on Trusts, 299 ; Billington's Appeal, 3 R. 48. Difference between guardian who has, and one who has not, had the fund in hand: Konigmacher's Appeal, 1 Pa. R. 207 ; Stem's Appeal, 5 Wh. 472. There must be reasonable probability that debt has been lost by neglect of guardian: Pine *v.* Downing, &c., 11 S. & R. 66. Guardians are allowed to convert personal into real estate :

Bonsall's Appeal, 1 R. 266; Johnson's Appeal, 12 S. & R. 317; Nyce's Estate, 5 W. & S. 254. Trustee responsible only for supine negligence: Twaddell's Appeal, 5 Barr, 15; Hume *v.* Hume, 3 Barr, 151; Bull *v.* Towson, 4 W. & S. 557.

*Blair,* contrà, and for the appellant wards.—By continuing the interest of the wards in the new firm of Thompson, Patton & Co., the guardian became liable equally for all profits and all losses: Worrall's Appeal, decided at March Term, 1849; Am. Law J. for May, 1849, page 525. By not realizing the funds on Thompson's judgment-note, he has made himself liable for negligence. Again, by the conversion of that note into land conveyed to him in his own name, he has rendered himself liable to account for the land or money at the election of the wards. He cannot make himself a trustee at his own option: Morris *v.* Wallace, 3 Barr, 319.

Royer is liable for interest from 25th March, 1836, to the decree, and not to the filing of his account: McCahan's Appeal, 7 Barr.

The opinion of this court was delivered by

COULTER, J.—To go no further back in the facts of the case than the investment of the funds of his wards by himself and partners in the transportation company—an enterprise of doubtful and equivocal safety—we find sufficient ground to impute culpable negligence and indifference to the guardian. Soon after this investment, which proved unfortunate, Royer, the guardian, sold to Thompson, one of his partners in the store and transportation company, his interest and that of his wards, for $5,111.57. For this sum and the amount of a note for $370, money which Thompson had borrowed from a former guardian, Thompson gave to Royer his judgment-note. One-third of the sum of $5,111.57 belonged to Royer in right of his wife, Mrs. M'Namara, the mother of his wards, he having married her before his appointment as guardian.

On the same day, at the instance of Thompson (who seems to have acted throughout with good faith and tenderness towards the children of M'Namara, his former partner), the note was divided, and one note given to Royer as guardian for two-thirds of the sum of $5,111.57 (also including the $370 for money borrowed as above mentioned), for the other third a note was given to Royer in right of his wife. Thompson was also indebted in a large sum to Royer on his own account. It was then the duty of the guardian to have collected the judgment-note of his wards. Thompson at that time had abundant means to secure the payment of the debt due the minors, if Royer had looked after it with any degree of vigilance. His

ability in real and personal property to answer the debt at that time is not denied.    The judgment-note was given by Thompson to the guardian the 11th July, 1839, and on the 3d day of October, 1840, Thomson executed to Royer, in his own name, a deed for what is called the Blairville property, consideration $5,865.53, a sum just equal to the amount due the minors, and Royer and wife, with interest.    Here was another change of the fund, and a conversion of it into real estate, a proceeding which nothing but imminent necessity can justify.    As the guardian took the deed in his own name, we may presume that if the land had appreciated in value, and turned out a good speculation, we should not have been troubled with this dispute.    But as it has now depreciated to a considerable extent, we may suppose the guardian seeks to fob off his wife's children and his own wards, with the land; and as a sufficient reason therefor, alleges and shows that on the 30th day of August, 1842, more than three years after he took the deed in his own name, he executed a deed of trust in favour of the minor children of James M'Namara, deceased, for two-thirds of the Blairville property, which declaration was duly recorded in Indiana county, on the 15th May, 1843.    I presume by that time the guardian had perceived some glimpses of the nature and value of the speculation which might be made in the lands.

For the $370, money borrowed from the funds of the wards, and which went into the purchase of the land by Royer, no provision was made in the declaration of trust—that being perhaps forgotten. The guardian now files his account and prays credit for the land, or rather declines and refuses to charge himself with the sum of $3,777.72, money belonging to his wards, which he put into that purchase.

Every doctrine of natural justice, every principle of judicial equity, and every sound maxim of law which can be brought to bear on the case, require that the guardian shall account for the money.

Why did he not enter up the judgment-note when he was warned by Thompson that his condition was perilous, and that he wished to do justice to the minors ?    Why did he take a conveyance of the land in his own name, and receive the personal property of Thompson in satisfaction of his own personal claim, separate from the claim he had in right of his wife ?    There was a conflict of interests, and the *guardian*, it would seem, resolved to hold that of his wards in jeopardy, at the option of taking the land himself if it rose in value, and throwing it back on the minors if it fell; whilst the interests of the *man* were cared for by taking personal estate.

A fiduciary relation requires vigilance as well as honesty. A dead and sluggish calm—a supine negligence—is full of peril to the minor: it is often as fatal as positive dishonesty. The guardian might have secured and collected the money by the means which Thompson put into his hands. All that was necessary for him to do was discreetly to use them. That he did not do, and, therefore, he ought to account to the minors.

The sum of $5,111.57 was due by the firm of Thompson & Co. to the heirs of M'Namara, as the account was settled, in 1836, by John Thompson, the surviving partner; and, as Royer was appointed guardian in that year, he ought to be charged with interest from that date, on the sum of $3,407.72, up till the time of the decree. It is very probable that he ought to be charged interest for a much larger sum; but the paper-books do not furnish us the means of determining whether that sum included interest on what was due at the death of M'Namara, up till 1836, or not. Perhaps it did, and perhaps it did not. He must also be charged interest on the note for $370, from the time it was payable, till decree made. I cite the case of Dietrich's Appeal, 5 Barr, 78, as authority for charging the guardian with the price of the land; or, in other words, with the money of the minors which he converted, together with interest; as, also, the case of M'Cahan's Appeal, 7 Barr, 56.

The evidence of facts in the paper-book does not furnish the materials for a decree, as the account of the guardian is not there; nothing but the disputed items. The record is therefore remitted to the Orphans' Court, and a *procedendo* awarded, for the purpose of charging the guardian with the sum of $3,407.72, with interest from the 24th of March, 1836, till the date of the decree; and, also, with the sum of $370, the amount of the note, and interest from the time it was payable until the date of the decree.

As the wards appealed, and also the guardian, a decree on the basis above set forth covers the case on both sides.

Record remitted, and *procedendo* awarded.